In the Matter of LIBERAL MARKET, INC., Debtor.

Bankruptcy No. 3–81–00305.

United States Bankruptcy Court, S. D. Ohio, W. D.

March 20, 1981.

Thomas Noland, Dayton, Ohio, for Union.

Jay Rosenberg, Cincinnati, Ohio, for Creditors' Committee.

Peter Donahue, Dayton, Ohio, for debtor.

Ira Rubin, Dayton, Ohio, examiner.

Fred A. Hayes, New York City; John T. Ducker, Dayton, Ohio, for creditor.

## FINDINGS OF FACT

CHARLES A. ANDERSON, Bankruptcy Judge.

The Liberal Market, Inc. filed a voluntary petition under Chapter 11 of the Bankruptcy Code on 4 February 1981, listing total assets in the amount of $22,551,000.00 and total liabilities in the amount of $29,117,000.00, of which the amount of $8,600,000.00 was delineated as secured.

Prior to filing, a protracted labor dispute had been in process between the Debtor and United Food and Commercial Workers Union, Local 1552 (United), and the Amalgamated Food and Allied Workers, District Union No. 430 (Amalgamated), both of which are affiliated with the United Food and Commercial Workers International Union, AFL–CIO. The Collective Bargaining Agreement had expired on 19 January 1981, and a bitter strike was in process.

Before the strike, 17 super markets in Hamilton, Fairborn, Dayton and Cincinnati, were open for business (several stores having been closed during the previous two years). Two stores were closed shortly before the strike, five were closed after the strike, and eight were in operation after the Chapter 11 case was instituted.

Upon motion filed on 2 March 1981 by a major supplier, Malone & Hyde, Inc., raising the question of adequate protection, and upon consent of the Debtor-in-Possession, the operation of the business was ordered terminated by order entered 3 March 1981.

On 3 March 1981, the union filed an application, seeking the appointment of an "Operating Trustee" and "for such other and further relief as this Court may seem just and proper." In pertinent part, it was alleged that the Debtor [in Possession] was continuing payments on unoccupied leased premises, "apparently owned by one of the principal shareholders of the Debtor; and, that Debtor [in Possession] has been selling inventory for as little as one-half its actual value without the permission of the Court."

At a preliminary hearing held on 9 March 1981 on this application, the Creditors' Committee declined to join because of the need for additional time to analyze the business operations. Insufficient evidence as to fraud, dishonesty, incompetence or gross mismanagement by current management, or similar cause for the appointment of a trustee was adduced to justify a finding, although there was a general consensus that the value of the assets would be naturally more enhanced by a going business posture. In behalf of the Unions it was testified that no operating capital could be derived from this source; although, there was testimony that prospects for sale might exist (to sources not disclosed) for the more prosperous locations.

At a continued hearing held on 16 March 1981, the Creditors' Committee joined in support of the motion for appointment of a trustee and filed a memorandum expanding allegations for cause in greater specificity. Summarized, the Committee represented that the "accounting records of the Debtor are likely to be unreliable"; that Debtor "owes its parent corporation and affiliated entities in excess of $7,000,000.00" upon which there had been substantial repayments within the last year; leases of properties from the parent and/or affiliates; the Debtor "shares common officers with its parent and affiliates"; and that the "parent company, two of its affiliates and four of its officers and directors are guarantors" on the debt of the principal secured creditor, Malone and Hyde, Inc. and M&H Financial Corp. Conclusions from this, suggesting dishonesty, conflict of interest and "multiple improprieties", were urged. These allegations were based in great part upon Debtor's own Schedules and Statement of Affairs filed in the case.

In behalf of the Debtor-in-Possession, it was admitted that there is no present intention of devoting any effort to reopen any of the stores; and that a search for buyers is contemplated, as a liquidation of all assets.

## DECISION AND ORDER

Based upon the preliminary records before the court and the conclusions urged by the Creditors' Committee, considerable reason exists to appoint a trustee (or examiner, at least).

It must be noted, however, that the allegations of "improprieties" may be a rationalization, which additional facts might mitigate. Because of the need for the urgency in charting a course and the rapidity of hearing schedules, it must be obvious that counsel for the Debtor-in-Possession were seriously hampered in mustering a rebuttal position.

The court feels constrained, therefore, to draw no conclusion at this time as to "cause", as postulated by movants under the provisions of 11 U.S.C. § 1104(a)(1).

However, the question of "the interests of creditors ... and other interests of the estate" under § 1104(a)(2) must be confronted for several reasons.

In behalf of Debtor it has been urged that assuming that the appointment of a Trustee is clearly in the interests of creditors, Section 1104(a)(2) requires that the appointment be also in the interests of any equity security holders. As urged, "It is clear on the face of the statute that the test to appoint a Trustee ... is a conjunctive test; a test that finds the appointment of the trustee in the interests of creditors and any equity security holders and other interests of the estate."

This is an interesting reading of the statute. The court can concur in this proposition to the extent that there should be no purpose in appointing a trustee to discriminate unfairly and illegally against the interests of any class, as such. There are other statutory safeguards, nevertheless, to cope with the treatment under a plan of reorganization to be afforded the various types of interests. There is no variation in the confirmation standards after the appointment of a trustee (or an examiner).

11 U.S.C. § 1129(a)(8) requires that each class either have accepted the plan or remain unimpaired. Also, we again draw attention to the severe inadequacy of assets to meet liabilities if there is to be a liquida-

tion plan. If liquidation occurs, the equity interests are already submerged and valueless. Vestiges of the "absolute priority rule" still arise, and a plan proposed must be fair and equitable to all impaired classes. Under 11 U.S.C. § 1129(b)(2)(C)(ii), the court must confirm a plan despite the dissent of a class of interests if the holders of any interests junior to a dissenting class will not receive or retain any property on the strength of such junior interests.

Hence, the conclusion is inescapable that whenever the appointment of a trustee (or examiner) is in the interests of senior classes, junior classes will not be affected adversely and can only be correspondingly benefitted as senior interests are satisfied. The prime factor for all classes is the maximizing of values.

The first factor involved is the nature of the "reorganization" case as it is now existing. Even though Section 1123(b)(4) permits a plan of reorganization to provide for sale of all or substantially all of the property of the estate, this feature must be read *in pari materia* with Section 1123(a)(5)(D) which contemplates the sale in the execution of a plan of reorganization.

The second factor of substance is the recommendation of the Creditors' Committee appointed by the Court. It is the Committee which is charged with the responsibility and interposition for the creditors between the debtor-in-possession and the judicial process, as fiduciary. The Committee, furthermore, is composed of very busy businessmen who cannot be expected to devote valuable time in actively monitoring all of the day by day intricacies of a liquidating process. In such a case as now *sub judice* the end product is finite—there will be no future potential for the various classes, and no viable business to reorganize.

The estate and the court are confronted with an emergency situation, the consequences of which very likely will be fatal to the best interests of all interested parties. The fact is not subject to any controversy that the business operations should if possible be reinstituted (and the sooner the better), if a going concern value is to be achieved for the business assets. Every day that the business is closed will directly diminish the feasibility of operating various stores, particularly the more profitable locations because customers will rapidly find other sources of supply.

Debtor's management has unequivocally concluded that no efforts will be made by management to reopen, and no operating capital will be forthcoming from that source. The Creditors' Committee and the unions particularly urge that the business must be operated, although they also have not furnished the source or sources of operating capital.

Since the economic and financial conditions are so desperate and critical, it is obvious that the appointment of a statutory trustee with full powers, authority and duties would be ill-advised, if not foolhardy, because of the consequent, overwhelming drain on assets for the non-productive, administrative expenses of a trustee, especially duplicative of the efforts by Debtor's management to operate the business under the burden of protracted collective bargaining in the labor market for several years. Presumably in the winding down of the business and the liquidation of business assets, submarginal stores would remain closed.

The equity jurisdiction of the bankruptcy court and the functions of the All Writs Statute, 28 U.S.C. § 1651, and 11 U.S.C. § 105 are available to supply interstitial procedural devices in adapting the reorganization vehicle to a viable liquidation vehicle. Furthermore, it may well be rationalized on final analysis that the request for a trustee or "other relief" under such conditions as now exist is in reality a request for conversion to Chapter 7 under 11 U.S.C. § 1112(b).

So as not to thwart the purposes of the Debtor-in-Possession to submit a Plan of reorganization, or other interested parties also to submit a Plan, an interim remedy will be fashioned in order to maintain maximized economic values until more mature business details can be mustered by the parties. The appointment of a trustee and divesting of the title of Debtor on the

present condition of the record should, therefore, be forestalled until the expiration of the statutory exclusive time limitations for the Debtor's proposed plan and confirmation, which has not to date been reduced. The appointment of a trustee will continue to be justiciable, upon presentation of more facts by interested parties.

When old case precedents were negated by providing for the liquidation of a business (11 U.S.C. § 1123(b)(4)), certainly such a liquidation is contemplated under Chapter 11 only in connection with a Plan duly confirmed, and not as a substitute to avoid the thrust and expedition of a Chapter 7 Trustee. It is still reasonable to read the spirit of such cases as *In re Pure Penn. Petroleum Co.*, 188 F.2d 851, 2d Cir. (1951), into any scheme of using a "reorganization" process as a subterfuge and overly luxurious administrative vehicle to accomplish a purpose no different from a more expeditious Chapter 7 liquidation. Hence, it is not unreasonable for the court to interpret and conclude in a liquidation Chapter 11 that the mere request to appoint a trustee, for either cause or best interests, may be deemed a request for conversion to a Chapter 7 liquidation. For reasons to be more apparent later, we do not now draw that conclusion.

The court is of the opinion that, short of a conversion, the Debtor should be permitted to exercise its statutory, exclusive right to submit a plan of reorganization and should be permitted to remain in possession, subject to imposed restrictions.

Based upon the record as it now exists, there is not sufficient proof of cause for appointment of a trustee because of fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or since the commencement of this case. If the stores can be feasibly reopened so as not to lose going concern value, similar cause might well exist on retrospection even before any additional proof has been offered.

This factor alone dictates that the possession and operation of the business by management, which has already concluded that the reopening of business operations is not feasible, should not be countenanced.

The court has a tool available under the terms of 11 U.S.C. § 1106(b), without regard to the equity jurisdiction of a bankruptcy court, to deal with the interests of the various parties now involved. We direct attention to the authority in this statute authorizing an examiner to perform "any other duties of the trustee that the court orders the debtor-in-possession not to perform." Hence, the court may give an examiner additional duties not specifically enumerated as circumstances such as involved *instanter* warrant. See House Report No. 95–595, 95th Cong. 1st Sess. (1977) 404, U.S.Code Cong. & Admin.News 1978, p. 5787. Obviously, operation of the business of Debtor is a function of a trustee conformably to 11 U.S.C. § 1108, which business operation does not even require a court order.

Based upon the foregoing summary analysis, It is

*ORDERED, ADJUDGED AND DE-CREED* that Ira W. Rubin should be and is hereby appointed as Examiner for and with the following purposes and duties, to-wit:

(1) Except to the extent that the court may order otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the Debtor, the operation of the Debtor's business and the desirability of the continuance of the business, and any other matter relevant to the case or to the formulation of a plan;

(2) As soon as practicable, file a statement of such investigation, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to any cause of action available to the estate;

(3) Assume the authority formerly vested in the Debtor-in-Possession to supervise and control the operation of the business, or any part thereof deemed advisable, upon approval of the Credi-

tors' Committee, and as soon as proper financing has been assured.

The Examiner may, at his discretion, draw from the Debtor-in-Possession current management personnel for the implementation of daily business activities.

(4) Recommend as soon as possible whether there should be a conversion of the case to a case under Chapter 7.

*ORDERED, ADJUDGED AND DECREED*, that all of the other statutory rights of a debtor-in-possession, including title and possession of debtor's assets, and the exclusive right to file a Plan of reorganization, shall remain intact and in full force and effect until further order herein.

*ORDERED*, that the chief executive officer, or nominee, of United Food and Commercial Workers Union, Local 1552, and also, of Amalgamated Food and Allied Workers, District Union No. 430, are hereby added as members of the Creditors' Committee heretofore appointed pursuant to 11 U.S.C. § 1102, unless or until a special additional committee of creditors be appointed which includes such labor union executives.