**In re GILMAN SERVICES, INC., Gilman Brothers, Inc., Rogers Wholesalers, Inc., Three Products Corp.**

**Bankruptcy Nos. 82–836–JG, 82–767–JG, 82–823–JG and 82–824–JG.**

United States Bankruptcy Court, D. Massachusetts.

Feb. 5, 1985.

---

Paula Bonnell, Boston, Mass., for movant.

Joseph Braunstein, Trustee, Riemer & Braunstein, Boston, Mass., for respondents.

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

This matter came before the Court on the Motion of the United States Trustee for an order authorizing the appointment of an examiner pursuant to 11 U.S.C. § 151104(b)(1)[1] in these four chapter 11 related cases. In support of the request, the United States Trustee alleges that there has been an unexplained loss of assets since the filing of the bankruptcy petition in May 1982; that the debtors' financial reports to the United States Trustee have been deficient in failing to accurately report income and expenses; that the debtors' transfer of their major real estate assets in 1980 to a partnership owned by certain shareholders of the debtors may have been a fraudulent conveyance which requires further investigation. The debtors oppose the appointment of an examiner and contend: that the 1980 sale of real estate was in the exercise of sound business judgment; that all reports filed with the United States Trustee were complete; and that debtors have sufficiently explained the losses and diminution of assets during the chapter 11 cases. The two creditors' committees oppose the appointment of an examiner and argue that it would cause undue delay and expense.

The Court held evidentiary hearings in this contested matter on May 9, 1984, June 5, 1984, and on July 19, 1984. All parties subsequently filed Memoranda of Law and the matter was taken under advisement. Based upon the testimony adduced at trial, the documentary evidence, a review of the applicable law and legislative history, the Court allows the Motion for the Appointment of an Examiner.

The four debtors filed chapter 11 petitions in May 1982 in response to involuntary petitions. Assets on the date of the filing had the approximate value of $16,-500,000. On the date of the filing of the petitions, the debtors owed to Wells Fargo Business Credit over $6,000,000, which had a first security interest in all assets of the debtors. Prior to the filing of the petitions, the debtors had been subject to an out-of-court "work out", in which they had granted a second security interest to trade creditors owed $600,000 pursuant to a trust agreement. This arrangement is known as "the Hoffman Trust". On a consolidated basis, debtors owed general unsecured debt of $11,200,000, excluding intercompany claims. Unsecured wage priority claims approximated $500,000 as of the petition date. The debtors are public companies whose common stock is publicly traded on the over-the-counter market and listed on the Pacific Stock Exchange. No equity security holders' committee or trustee has been appointed in these cases.

Through its wholly-owned subsidiaries, described below, Gilman Services was engaged in various businesses. Rogers and Gilman Brothers, wholly-owned subsidiaries of Services, comprised the principal business of Services and were engaged in the wholesale distribution of pharmaceuticals, cosmetics, health and beauty aids, toilet preparations, sundries and other similar products to drug stores and hospitals. Three P, a wholly-owned subsidiary of Services, was engaged in the business of producing and distributing generic drugs from a plant in Burlington, New Jersey. Rogers operated wholesale distribution centers

---

**1.** Since this is a pilot district in which the United States Trustee program is in effect, § 151104 is applicable. It is identical to Code § 1104 except that it gives the United States Trustee the opportunity to request an examiner. For the purposes of this opinion, the Court shall refer to § 1104 because legislative history is available.

from warehouses in Jamaica, New York ("Jamaica") and Lindenhurst, New York ("Lindenhurst"), and principally serviced the metropolitan area of New York city as well as on Long Island, New York. Brothers operated two warehouses, one in Dorchester, Massachusetts and the other in Manchester, New Hampshire and serviced most of New England. As of the filing date, Brothers leased the Dorchester real estate, pursuant to a lease agreement dated December 23, 1980 by and between Brothers and OBRT Limited, a Florida limited partnership. The debtors had been operating their business during the course of the chapter 11 case until the fall of 1982. Various orders were entered by the Bankruptcy Court authorizing the use of cash collateral and the granting of adequate protection to Wells Fargo and the Trustee (the "Cash Collateral Orders"). Pursuant to the Cash Collateral Orders, the Debtors remitted to Wells all collections of accounts receivable and Wells loaned the Debtors funds necessary to operate the business under borrowing formulas. Those formulas varied with each Cash Collateral Order. Wells Fargo was paid in full ($8,700,000) as of the fall of 1983.

During the course of the chapter 11 case, the debtors continually showed operating losses. Due to these losses, Rogers, with the approval of the Unsecured Creditors Committee, the secured creditors and the Bankruptcy Court, ceased business operations on or about June 1, 1982 and terminated the warehouse operations in Jamaica, transferred the remaining inventory to Lindenhurst at public auction sales on July 15, 1982 and July 16, 1982, respectively. Rogers vacated the premises in both Lindenhurst and Jamaica, and the Court approved the debtors' rejection of the leases for both locations. Further continuing losses forced Brothers to curtail business operations on or about August 1, 1982, also with the approval of the Unsecured Creditors Committee, the secured creditors and the Bankruptcy Court.

A private sale of the inventory of Brothers and Rogers was approved by the Bankruptcy Court and completed to James Brudnick Co., Inc. of Malden, Massachusetts ("Brudnick") for a purchase price equal to 70% of the Debtors' net invoice cost of the inventory. The terms of the sale to Brudnick were such that Brudnick would periodically receive inventory and deliver to the debtors Brudnick's non-interest bearing promissory notes, payable jointly to Rogers and Brothers. Brudnick has incurred liability to pay $1,600,000 for inventory to date.

The Schedules filed by the Debtors and Products indicate the following intercompany and affiliated debt:

1. Three P is due $4,143,433.00 from Services;

2. Three P is indebted in the amount of $4,888,216.00 to DCI Dexter Corp., and Services as sole stockholder thereof;

3. Rogers is indebted in the amount of $3,417,257.14 to Services; and

4. Services is indebted to other non-debtor subsidiaries approximately $161,770.49.

Even though six months after the filing all debtors had ceased operating and commenced a piecemeal liquidation of assets, they professed their intent to reorganize on a downscaled basis. The debtors proposed a reorganization plan to be funded by Bionic Instruments of Deleware, Inc., a ten percent shareholder in Gilman Services. Bionic withdrew the plan in late 1983.

The Hoffman trust has proposed a plan to pay unsecured creditors three percent (3%) on their claims prior to the Trust receiving any payment. This plan has not yet been confirmed. It has the support of the Creditors' Committees.

The three debtors, Gilman Services, Inc., Gilman Bros., Inc., and Rogers Wholesalers, Inc. filed cash flow statements with the United States Trustee on a consolidated basis. Three P filed its own cash flow statements. These reports reflect receipts of approximately $4,000,000 from the commencement of the case to May of 1984. They do not reflect collection of accounts receivable as income except for $250,000

collected in May 1982. Because a substantial portion of receivables were remitted directly to Wells Fargo the debtor omitted from cash flow statements approximately $8,000,000 in expenditures. The creditors committee and the court were generally aware of this arrangement. The cash flow statements also did not distinguish between cash receipts from new bank borrowings during chapter 11 and the receivables Wells Fargo paid to the debtor. In this regard, the cash flow statements omitted material information.

The cash flow reports also did not reflect the substantial losses sustained by the debtors during the chapter 11 operation in 1982. The debtor did not file monthly profit and loss statements with the United States Trustee as required by. his regulations. Had such statements been filed, they would have disclosed losses of over $5,000,000 during the period of chapter 11 operations for the six months in 1982. Instead the cash flow statements filed by the debtors for 1982 showed a positive cash flow when in fact there were $5,000,000 in losses during this time. The debtors' cash flow statements also did not reflect sales of inventory during the case to James Brudnick totalling approximately $1,600,000.

The United States Trustee points to the debtors' sale of its three warehouses in support of his request for the appointment of an examiner. In December of 1980 the debtors sold their three principal warehouses in Boston, Massachusetts, Jamaica, New York, and Lindenhurst, New York to Orange Blossom Realty Trust, Ltd. ("OBRT"), a Florida limited partnership, for $2,700,000. The principals of OBRT were Michael Light and Michael Dermer who collectively owned thirteen percent of stock in the debtors. OBRT is an affiliate of the debtors under applicable securities law. Although the purchase price was $2,700,000 only $2,450,000 was paid in cash and the debtors took back a $250,000 note for the balance. Later, debtors obtained a second mortgage on the properties. The note has never been collected. Simultaneous with the sale, the debtors agreed to lease the properties for a period of twelve years, at an annual rent of $432,500 per year. The debtors insist that the transaction was for the purpose of increasing necessary working capital. However, the debtors only received $192,000 in cash as a result of the sale. The sale of real estate had an unfavorable effect on cash flow. Whereas the debtors annual mortgage payments prior to the sale had been $200,000, as a result of the sale annual payments for rent doubled to over $400,000. During 1980 the debtors were experiencing severe financial difficulties. The addition of only $192,000 in working capital was not advantageous when compared with the negative effect on cash-flow. The sale was a poor business decision; alternative financing or a decrease in the size of operations would have been a better course.

## DISCUSSION

For the reasons set forth below, the appointment of an examiner is in the best interests of creditors, equity security holders, and the estate.

Section 151104(b) provides:

(b) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States Trustee, and after notice and hearing, the Court shall order the appointment or an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

(1) such appointment is in the best interest of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts or goods, services, or taxes or owing to an insider, exceed $5,000,000.

■ The appointment of an examiner under § 1104(b)(1)[2] is a matter of discretion. *In Re Lenihan,* 6 B.C.D. 368, 4 B.R. 209 (Bankr.D.R.I.1980). In exercising its discretion under this subsection the Court must determine whether the creditors and equity security holders would be served by the appointment of an examiner and whether the costs of an examiner are not disproportionately high. *See American Bulk Transport Co.,* 7 B.C.D. 279, 8 B.R. 337 (Bankr.D.Kan.1980).

■ A review of the legislative history of this subsection is helpful in understanding why an examiner is appropriate in this case. Under the former Bankruptcy Act, the appointment of a trustee was considered mandatory where the debtor's liabilities exceeded $250,000. The Bankruptcy Act of 1898, Sections 156, 158 (repealed 1979). When revisions to the bankruptcy laws were proposed in the 1970s, the Commission on Bankruptcy Laws of the United States recognized that "[a] an independent trustee is often desirable, especially involving the reorganization of a corporate debtor having substantial indebtedness and publicly-held securities". H.R.Doc. No. 137, 93rd Cong. 1st Sess., Pts. I at 252–53 (1973). The Senate version of the proposed 1978 Bankruptcy Code provided for a mandatory trustee for public companies, without regard to the size of the debtor. S.Rep. No. 989, 95th Cong.2d Sess. 9–10. The House version which ultimately became law deleted the mandatory trustee provision and instead provided the Court the alternative remedy of appointing a trustee or examiner, to be made on a case by case basis. *L. King, 3 Collier on Bankruptcy,* § 1104.1(6) at 1104–15 (15th ed. 1983). The examiner provision intended to provide the Bankruptcy Court with the alternative to the appointment of a trustee where it was unnecessary for the functionary to assume total control over the estate. *L. King, 3 Collier on Bankruptcy,* § 1104.03, at 1104–29 (15th ed. Supp.1983).

Still, the legislative history makes clear that in enacting § 1104 the drafters were desirous of providing extra protection to stockholders of public companies through the mechanism of an independent functionary.

■ The primary function of an examiner is to investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current or former management. 11 U.S.C. § 1104(b)(1) and 1106(b). Even though § 1104 provides for the appointment of an examiner to investigate allegations of fraud, dishonesty, and gross mismanagement, mere allegations of misconduct will not suffice; there must be a factual basis supporting the need for an independent investigation. *In Re Lenihan,* 6 B.C.D. 368, 4 B.R. 209 (Bankr.D.R.I.1980). A debtor's sale of assets to a related corporation before the commencement of the bankruptcy case warrants an investigation by an examiner where there are unanswered questions concerning the transaction and interrelationships of the parties involved. *See In Re Landscaping Services, Inc.,* 11 B.C.D. 1233, 39 B.R. 588 (Bankr.E.D.N.C.1984); *In Re 1243 20th Street, Inc.,* 6 B.C.D. 1190, 6 B.R. 685 (Bankr.D.C.1980); *Matter of Liberal Market, Inc.,* 7 B.C.D. 451, 11 B.R. 742 (Bankr. S.C.Ohio 1981). Failure to file accurate financial statements during the pendency of the case also may serve as cause for the appointment of an examiner or trustee. *See In Re Ford,* 11 B.C.D. 809, 36 B.R. 501 (Bankr.Ky.1983).

■ In addition to the requirement of cause, the Court must analyze the costs of appointing an examiner, to ensure that such costs are not "disproportionately high." Notes of Committee on the Judiciary, House Report No. 95–595. The benefit to the estate and the attendant protections of an examiner's investigation must

---

**2.** It should be noted that the United States Trustee's request is not for the appointment of an examiner on the ground that the unsecured non- trade debt exceeds $5,000,000. Therefore, subsection (b)(2) plays no part in this decision.

outweigh the expenses. *Matter of Hamiel & Sons, Inc.*, 9 B.C.D. 321, 20 B.R. 830 (Bankr.S.D.Ohio 1982). Where a debtor is not operating and the estate is not being depleted, the delay caused by the appointment of an examiner cannot be considered detrimental. *In Re Shelter Resources Co.*, 11 B.C.D. 811, 821, 35 B.R. 304 (Bankr.N.D. Ohio 1983). The appointment of an examiner is a cautious, intermediate procedure which is more economical than the appointment of a trustee. *In Re Albert Harlow*, 11 B.C.D. 907, 34 B.R. 668 (E.D.Pa.1983).

In the present case, there exist several areas of concern to the Court which deserve further investigation by an examiner: the debtors' post-petition losses, inadequate record-keeping, and reporting and the 1980 real estate sale. The first area of concern to the Court is the inadequately explained losses which have occurred during the pendency of these chapter 11 cases. During the first six months of chapter 11 the companies sustained approximately $5,000,-000 dollars in operating losses. There has been a diminution in assets of $5,000,000 dollars during the pendency of the case. Moreover, the debtor's costs while operating in a liquidating posture are astronomical when compared to income realized. The financial statements submitted to the United States Trustee and to the Court by way of documentary evidence are inadequate to permit an intelligent reconstruction of the debtors' financial history. The debtors have not provided an accounting and simply rest on their having disclosed the losses to interested parties. The debtors have only accounted for $2,200,000 in sales of inventory sold to Brudnick (for $1,600,000). No explanation has been given for disposition of the remaining $2,000,-000 in inventory debtors listed as assets on the date of the filing of the petition. The debtors merely state that inventory was sold at a loss. This explanation is hardly

sufficient. No accountant has been employed by either creditors committee. In my view an independent audit is necessary. The unsecured creditors, who are receiving minimum payment under the latest plan, and the stockholders, who are receiving nothing, deserve a more thorough explanation of the debtors' recent financial history.

■ The next area of concern is the sale of real estate to OBRT. One of the functions of an examiner is to investigate potential causes of action available to the estate. Not only was the sale of the debtors' principal assets a poor business decision, it may have been a fraudulent conveyance voidable in an action under Massachusetts law brought against OBRT by the creditors' committee, debtor or a trustee, through the avoiding powers of 11 U.S.C. § 544.[3]

Neither the debtor nor either creditors committee has elected to pursue such an action. Even a cursory review of the transaction leads me to the conclusion that the transfer may have been accomplished with actual intent to hinder, delay and defraud present or future creditors, which would permit avoidance of the transfer under Massachusetts General Laws Chapter 109A § 7. The debtors admit to serious financial problems in 1980. The debtors' asserted defense—the need for "working capital"—is not credible. The debtors took back a $250,000 note in the transaction, which does not make sense if the true purpose of the sale was to raise capital. Moreover, the transaction only raised $200,000 which is negligible in view of the size of the debtors. The inference can certainly be drawn that the transaction was not to raise capital but was intended to shield the real estate from creditors. In light of OBRT's principals' affiliations with the debtor, strict scrutiny is required.[4]

---

**3.** 11 U.S.C. § 544 permits a trustee, and thus a debtor in possession, 11 U.S.C. § 1107(a), to avoid any transfer of property of the debtor that is voidable by a hypothetical lien creditor, bona fide purchaser, or actual unsecured creditor under applicable law. The fraudulent conveyance

statute under Massachusetts law is contained in M.G.L. c. 109A sections 4, 5, 6, 7.

**4.** The above discussion is not intended to restrict the examiner to an investigation of the transaction as a fraudulent conveyance. Other

■ The need for further investigation outweighs the attendant costs of an examiner. Although the time required by the investigation is at this point uncertain, I am convinced that a thorough audit of the debtors affairs since 1982 could be performed within several months. Even though potential litigation may result from an investigation of the real estate transaction, the need for further inquiry for the protection of creditors and shareholders of this public company outweighs any delay.

Accordingly, the Motion for the Appointment of an Examiner is allowed.

causes of action, such as breaches of fiduciary duties by management, may exist as well.