**In re Herbert E. RUSSELL,
Debtor-in-Possession.**

**Bankruptcy No. ED 84–58M.**

United States Bankruptcy Court,
W.D. Arkansas,
El Dorado Division.

March 28, 1985.

See also, Bkrtcy., 62 B.R. 135.

James E. Smith, Jr., Little Rock, Ark., for debtor.

Isaac A. Scott, Little Rock, Ark., for Allied Bank.

Charles W. Baker, Little Rock, Ark., for Unsecured Creditors' Committee.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

Herbert E. Russell, an individual, filed for relief under the provisions of Chapter 11 of the Bankruptcy Code on July 18, 1984. On August 14, 1984, schedules and statements of affairs were filed. The debtor lists $33,035,505.10 in assets and $23,-250,718.65 in liabilities although he now admits that in reality liabilities exceed assets by a substantial amount. The case is complicated because of the diverse nature of the debtor's business affairs. For instance, the debtor owns or has an interest in at least 14 different corporations and twelve different partnerships. The debtor's assets consist of stocks, bonds, cash, interests in real property, investments, interests in oil, gas and mineral leases, hotels, airlines, apartments and condominiums, treasury bills, and cattle and row crop farms.

On November 7, 1984, the Unsecured Creditors' Committee filed a motion pursuant to 11 U.S.C. § 1104 for the appointment of a trustee. On February 11, 1985, the debtor filed his first proposed plan of reorganization and a proposed disclosure statement. A hearing on the adequacy of the disclosure statement is forthcoming. The motion for appointment of a trustee was heard on March 4, 1985.

The debtor-in-possession is 58 years old and a lifelong resident of Arkansas and is presently a resident of Garland County. Prior to 1971, the debtor owned a corporation known as Tex-Iron. The debtor had financial difficulties which, according to his testimony, required him to convey the stock in Tex-Iron to a bank in south Arkansas, although the bank allowed Mr. Russell to remain as an employee. The debtor then filed a Chapter 7 bankruptcy from which his creditors received no distribution. He continued as an employee of Tex-Iron after the bankruptcy, and Tex-Iron was sold by the bank to some gentleman from Texas. According to Mr. Russell, he was given an option to purchase one-quarter (¼) of the outstanding stock in Tex-Iron because of faithful and productive service to the corporation. Mr. Russell's recovery from the effects of his 1971 bankruptcy was miraculous. In June of 1973, he traded his option in Tex-Iron for three-quarters (¾) of the outstanding stock in a corporation called Rustex Oil, Inc. (Rustex) a corporation in which he had already purchased a twenty-five percent (25%) interest. In 1978, Mr. Russell transferred ten percent (10%) of the stock in Rustex to his son, Wayne, and on December 1, 1980, Rustex, sold its interest in the Dorcheat Macadonia oil field to Ladd Petroleum for $25,000,-000.00 cash. According to the disclosure statement, this transaction netted Mr. Russell, after payment of expenses, debts of the corporation, and taxes, the sum of $12,-385,000.00 cash.

Since this case was filed, the debtor-in-possession has liquidated approximately $9,000,000.00 worth of property of the estate. Substantially all of the property liquidated has been by conveyances to secured creditors and has resulted in relative-

ly little cash to cover the on-going and substantial administrative expenses.

The plan proposes that the debtor liquidate all of his assets, except his exempt assets, and the creditors be paid pro rata according to the priorities for payment under Chapter 7. The plan provides that the debtor supervise his own liquidation and receive compensation from his own estate for such services at the rate of $5,000.00 per month, plus expenses. The compensation does not include other expenses of administration such as clerical help, legal fees, and accounting fees, as well as the services of Joy Wolfe, a key employee, who is also a CPA, whose compensation was specifically fixed in the plan at $3,000.00 per month. The disclosure statement estimates administrative expenses for nine months in 1985 to amount to $340,000.00, including compensation payments to the debtor.

■ The principal purpose of Chapter 11 is to restructure business debts so that the business may continue to operate and the creditors receive the "going concern" value of the assets of the estate as opposed to liquidation value which is generally considered to be worth less. *In re Fitzsimmons*, 725 F.2d 1208 (9th Cir.1984); *In re Barsky*, 6 B.R. 624 (Bkrtcy.E.D.Pa.1980); *Matter of Levinsky*, 23 B.R. 210 (Bkrtcy.E.D.N.Y.1982). Chapter 11 is not restricted to business entities because 11 U.S.C. § 109(d) defines the person who is eligible for relief under Chapter 11 as:

(d) Only a person that may be a debtor under chapter 7 of this title, except a stockbroker or a commodity broker, and a railroad may be a debtor under chapter 11 of this title.

■ A plan of liquidation under Chapter 11 is permitted because it is not expressly precluded by the Code. *Official Creditors' Committee v. Liberal Market*, 13 B.R. 748 (Bkrtcy.S.D.Ohio, W.D.1981). The use of Chapter 11 for purposes of liquidation has been criticized and even denied where the purpose is:

[a] scheme of using a 'reorganization' process as a subterfuge and overly luxurious administrative vehicle to accomplish a purpose no different than a more expeditious Chapter 7 liquidation. *Matter of Liberal Market, Inc.*, 11 B.R. 742, 745 (Bkrtcy.S.D.Ohio 1981). *See, In re Pure Penn. Petroleum Co.*, 188 F.2d 851 (2nd Cir.1951).

Likewise, in Chapter 11 debtors-in-possession should "not continue in control of their business under the umbrella of the reorganization court beyond the point at which reorganization no longer remains a realistic undertaking, unless liquidation would proceed more expeditiously and less expensively under control of the debtor." *In re L.S. Good & Co.*, 8 B.R. 315, 318 (Bkrtcy.N.D.W.Va.1980); *See, Matter of W.J. Rewoldt Company*, 22 B.R. 459 (Bkrtcy.E.D.Mich., S.D.1982).

The creditors' committee urges that a trustee be appointed because the debtor is guilty of gross mismanagement, fraud, and inequitable conduct and also urges that the appointment under § 1104(a)(2) is in the best interests of creditors, equity security holders, and other interests of the estate.

■ The burden of proof is on the creditors' committee as the moving party.

The appointment of a trustee in a Chapter 11 is considered by many courts to be extraordinary relief. *In re Deena Packaging Industries, Inc.*, 29 B.R. 705 (Bkrtcy.S.D.N.Y.1983); *In re Anchorage Boat Sales*, 4 B.R. 635 (Bkrtcy.E.D.N.Y.1980). It is presumed that a Chapter 11 debtor should remain in possession and manage its own affairs, *In re Deena Packaging Industries, Inc.*, 29 B.R. at 705; *In re Garland Corporation*, 6 B.R. 456 (Bkrtcy.D.Mass. 1980); *In re Eichorn*, 5 B.R. 755 (Bkrtcy.D.Mass.1980).

Bankruptcy Code § 1104 provides for the appointment of a trustee. This provision of the Bankruptcy Code arises from a compromise of House Reports [1] and Senate Re-

---

1. House Report No. 95–595, 95th Cong. 1st Sess. (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

ports[2] so there is little legislative history available. Clearly, § 1104 provides a flexible standard for the appointment of a trustee in reorganization cases. *In re Eichorn,* 5 B.R. at 755; *In re Ford,* 36 B.R. 501 (Bkrtcy.W.D.Ky.1983).

Section 1104 of the Code deals with discretionary and mandatory guidelines for the appointment of a trustee and provides:

§ 1104. Appointment of a Trustee or Examiner.

(a) At any time after the commencement of a case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

Subsection (a)(1) reflects criteria that mandates the appointment of a trustee, upon a showing of fraud, before or after the filing of the petition, or dishonesty, incompetence or gross mismanagement. *In re Eichorn,* 5 B.R. at 757; *In re Philadelphia Athletic Club, Inc.,* 15 B.R. 60 (Bkrtcy.E.D.Pa.1981).

■ These specific acts of the debtor or debtor-in-possession are not exclusive causes for the appointment of a trustee. *In re Ford,* 36 B.R. 501 (Bkrtcy.W.D.Ky. 1983). A court has discretionary powers for appointing a trustee pursuant to subsection (a)(1), although such discretion should be limited to a determination of whether "cause" exists. *In re Eichorn,* 5 B.R. at 758.

Under subsection (a)(2), a court is allowed to exercise its broad equity powers when appointing a trustee to protect the interests of creditors, equity security holders and other interests ·in the debtor's estate. *In re Deena Packaging Industries, Inc.,* 29 B.R. 705 (Bkrtcy.S.D.N.Y.1983); *In re Eichorn,* 5 B.R. at 758.

■ A trustee will be appointed when the debtor-in-possession is incapable of performing his fiduciary duties. *In re Ford,* 36 B.R. at 504. *See, also, In re William H. Vaughn & Co., Inc.,* 40 B.R. 524 (Bkrtcy.E.D.Pa.1984); *In re Philadelphia Athletic Club,* 15 B.R. 60 (Bkrtcy.E.D.Pa. 1981); *In re Deena Packaging Industries, Inc.,* 29 B.R. 705 (Bkrtcy.S.D.N.Y.1983); *In re Hotel Associates, Inc.,* 3 B.R. 343 (Bkrtcy.E.D.Pa.1980); *In re Eichorn,* 5 B.R. 755 (Bkrtcy.D.Mass.1980).

### Alleged Fraudulent Conduct

Less than one month before the filing of the bankruptcy petition the debtor owned two substantial assets, Emerald Isle Co., owner of a time share development located near Hot Springs, Arkansas, and Boardwalk Shopping Center, a shopping center located nearby. Emerald Isle Co. was owned by Russell-Bottoms, Inc. which was owned seventy-five percent (75%) by Herbert E. Russell.[3] The debtor's key employ-

2. Senate Report No. 95–989, 95th Cong., 2nd Sess. (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

3. Around the time this sale occurred, Herbert Russell owned ⅔ of the stock in Russell-Bottoms, Inc., and Rodney Bottoms owned ⅓ of the stock. Mr. Russell purchased Mr. Bottoms' stock in consideration of Russell-Bottoms, Inc.'s transfer of one of its assets (Stock in Arkansas Bank & Trust). This would constitute a fraudu-

lent conveyance as to creditors of Russell-Bottoms, Inc., now named Herbert Russell Investments, Inc. This corporation is listed as having a fair market value of only $30,498.00. The value of the corporate asset transferred to purchase its own stock is not shown, and this transaction was neither listed on the petition nor shown in the disclosure statement. A corporation which purchases its own stock receives no value. *In re Roco Corp. d/b/a Standard*

ee, Joy Wolfe, whom this Court has found in previous hearings to be a competent, knowledgeable, and honest witness, admitted in the debtor's presence at the first meeting of creditors that the Emerald Isle project had a present value of $9,000,000.00 to $10,000,000.00 and would cash flow up to $17,000,000.00 so long as the owner could find an institution to sell its contracts to and find other suitable financing. The debtor would not disagree with her assessment of the value with the qualification regarding suitable financing. The debtor at the hearing testified that Emerald Isle was the only substantial asset he had in 1984 which had a positive cash flow and acknowledged that the cash flow was projected in slow months to equal $150,000.00 per month and in good months $400,000.00 to $500,000.00 per month. The debtor testified that this project alone would generate funds sufficient to pay the multimillion dollar claim of Allied Bank of Texas (Allied Bank) in full. The debtor testified that in 1984 he was having difficulty arranging for appropriate financing and had negotiated a deal with some local banking institutions, but that Allied Bank, the debtor's largest single creditor, objected. Allied Bank threatened to call all loans the debtor had with it (approaching $8,000,000.00) if the debtor structured his financing as contemplated. The debtor stated that this threat effectively squelched the deal. The debtor apparently decided not to pursue the financing further and instead, less than one month before filing bankruptcy, sold Emerald Isle and Boardwalk Shopping Center to Dan Lasater through Lasater Development, Inc. The debtor claimed he had no choice because he could not find suitable financing and was about to be foreclosed.

The consideration for the sale was as follows:

| | | |
|---|---|---|
| a) | Assumption of trade debt | $ 1,200.00 |
| b) | Assumption of construction mortgage to Landmark Savings & Loan (Landmark) | $ 781,000.00 |
| c) | Assumption of Mortgage on Boardwalk Shopping Center to Landmark and second mortgage on Emerald Isle | $ 655,000.00 $ 300,000.00 |
| d) | Assumption of contingent liability at Landmark and Arkansas Bank & Trust (AB & T) | $1,200,000.00 $2,500,000.00 |
| e) | Payment of Royalty A due no sooner than five years from closing | $ 90,000.00 |
| f) | Payment of Royalty B due no sooner than five years from closing | $ 742,560.00 |
| | TOTAL | $6,269,760.00 |
| | Less assumed value of contracts securing contingent debt to Landmark and AB & T | ($3,700,000.00) |
| | Less cash reserve at banks for land contracts | ($ 575,300.00) |
| | TOTAL CONSIDERATION | $1,994,460.00 |

Simultaneously with the transfer of the Emerald Isle project and Boardwalk Shopping Center, the debtor procured two additional contracts with Lasater Development, Inc. One contract was a management contract between Herbert Russell Investments, Inc. and Lasater Development, Inc. The other contract was between the debtor, individually, and Lasater Development, Inc. and was for "consulting work" for a term equal to the rest of the debtor's life or full completion of all phases of the Emerald Isle development, whichever is longer. The consulting contract provides that the debtor may serve as a director of Lasater Development, Inc., and as compensation for these "consulting" services, debtor is to receive three percent (3%) of all gross sales of Emerald Isle, payable monthly. The contract was executed in June, 1984, and the debtor testified that he has received since he filed bankruptcy approximately $10,000.00 per month under this arrangement in addition to the $5,000.00 per month which he has withdrawn from the estate for "services rendered" for a total of $120,000.00. The debtor asserts that the sale of Emerald Isle and Boardwalk Shopping Center was for the benefit of creditors in that

*Supply Company,* 21 B.R. 429, 9 B.C.D. 233 (Bkrtcy.D.R.I.1982); *In re Gerson,* 35 B.R. 129 (Bkrtcy.App. 9th Cir.1983).

it eliminated potential claims against the estate of over $4,400,000.00. The creditors' committee points to this transaction as evidence of fraud. The Court agrees with the creditors' committee.

This transaction follows an all too familiar pattern of fraud by a financially embarrassed debtor on the eve of bankruptcy. The deal was structured every way possible to avoid claims of creditors. For instance, the only cash from the sale which the debtor acknowledges is property of the estate to be used to satisfy creditors claims is Royalty A, $90,000.00, and Royalty B, $742,560, neither of which is payable until 1990. The plan filed by the debtor, although not requiring that it be done, provides that the liquidation occur over a one-year period. It is not unreasonable to suppose that creditor interest in the case would have waned by 1990; nevertheless, the debtor will have earned under the confirmed plan by 1990, $300,000.00 compensation from the estate excluding the $720,000.00 from the "consulting contract." Many of the so-called "badges of fraud" are present here: grossly inadequate consideration, insolvency of the transferor, retention by the transferor of substantial personal benefit from the sale of property, and a transaction which differs from usual business practices. According to an exhibit to the disclosure statement, "Schedule of Assets and Liabilities and Credit Distribution," Emerald Isle and Boardwalk are still listed as assets of this debtor and are apparently still counted as assets on the most recent operating reports filed with this Court.

The "consulting contract" is characterized as a contract for personal services presumably because earnings resulting from personal services are not property of the estate in a Chapter 11, and, therefore, are not available to pay claims of creditors even if these monies are received during the administration of the estate. 11 U.S.C. § 541(a)(6). *In re Summerlin*, 26 B.R. 875 (Bkrtcy.E.D.N.C.1983); *Matter of Sundale Associates, Ltd.*, 23 B.R. 230 (Bkrtcy.S.D. Fla.1982); *In re Fitzsimmons*, 725 F.2d 1208 (9th Cir.1984). Significantly, the "consulting contract" provides that Mr. Russell may engage in any other employment with no restriction as to the time spent on the outside employment. The debtor is to receive his money monthly, whether or not he is able to perform any services under the contract by reason of his absence or temporary or permanent disability or illness. The contract also binds any subsequent purchaser of Emerald Isle to assume the debtor's consulting contract and can only be terminated for "good cause shown or by mutual written consent." This contract also indicates that it is assignable.

When asked about his duties under the "consulting contract," the debtor described generally what the Court perceives to be duties under the management contract for which his corporation is receiving compensation on behalf of the estate in amounts computed to be consumed by the operating expense of the management company. The debtor is able in this fashion to have the estate pay the salaries of key employees at no expense to himself while they assist in the performance of his "duties" under the consulting contract.

A debtor-in-possession is a fiduciary for the creditors of the estate and has the same duties as a trustee appointed by the Court. 11 U.S.C. § 1107; *In re UNR Industries, Inc.*, 30 B.R. 609 (Bkrtcy.N.D. Ill., E.D.1983). It is the debtor-in-possession's duty to protect and preserve assets of the estate, not the duty of the creditors. *In re Halux*, 665 F.2d 213 (8th Cir.1981); *In the Matter of Liberal Market, Inc.*, 11 B.R. 742 (Bkrtcy.S.D.Ohio, W.D.1981). The transaction described above is hardly the work of a fiduciary, and, therefore, a cause of action may exist in favor of the estate under 11 U.S.C. § 548 and 11 U.S.C. § 542 to recover property of the estate. *See, Bank of Sun Prairie v. Hovig*, 218 F.Supp. 769 (W.D.Ark.1963); *In re Checkmate Stereo & Electronics, Ltd.*, 9 B.R. 585 (Bkrtcy.E.D.N.Y.1981).

Furthermore, Mr. Russell's claim that his "personal services" agreement is

not property of the estate is questionable and, therefore, is subject to a complaint for a turnover order under 11 U.S.C. § 542. It is unreasonable to suppose that the debtor-in-possession would choose to sue himself.

Other reasons are advanced for the appointment of a trustee. These are not overlooked by the Court but the Court declines to address these reasons because it is unnecessary.

The motion for the appointment of a trustee is granted and Hon. Festus H. Martin and the Hon. William Gibson, both of Fayetteville, Arkansas, are appointed co-trustees with compensation to be set in accordance with the Bankruptcy Code, after notice and a hearing. Counsel for the debtor-in-possession, Mitchell, Williams, Selig, Jackson & Tucker, are removed as counsel for the estate. All other professional persons and staff presently employed by the debtor-in-possession shall be continued in their employment, if they desire, subject to their removal at the discretion of the trustees. The authority of the debtor-in-possession to operate his business is terminated, immediately, and such authority under 11 U.S.C. § 1106 is hereby granted to the trustees appointed herein. Bond is set at $1,000/personal until the trustees file their inventory, after which bond will be set accordingly.

IT IS SO ORDERED.