### In re GLIATECH, INC., et al., Debtors.
### No. 02–15045.

United States Bankruptcy Court, N.D. Ohio, Eastern Division.

March 1, 2004.

Sean Malloy, Esq., Cleveland, OH, for Debtors.

James Lawniczak, Esq., Cleveland, OH, for Unsecured Creditors Committee.

Claudia FitzGerald, Esq., Cleveland, OH, for Riverside Contracting LLC.

### MEMORANDUM OF OPINION REGARDING MOTION FOR APPOINTMENT OF EXAMINER

PAT E. MORGENSTERN–CLARREN, Bankruptcy Judge.

Riverside Contracting LLC, a Gliatech, Inc. shareholder, moves to appoint an examiner to protect the interests of Class 6 and 7 creditors in the debtors' proposed liquidating chapter 11 plan. (Docket 1118). The debtors and the unsecured creditors' committee oppose the request. (Docket 1198, 1199). For the reasons stated below, the motion is denied.

### JURISDICTION

Jurisdiction exists under 28 U.S.C. § 1334 and General Order No. 84 entered by the United States District Court for the Northern District of Ohio. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (L) and (O).

### FACTS [1]

The debtors Gliatech, Inc., Gliatech Medical, Inc., and GIC, Inc. filed chapter

---

1. At the hearing, counsel stated that Riverside did not intend to offer evidence in support of

11 petitions on May 9, 2002. With court authority at an earlier point in the case, the debtors sold their ADCON gel assets [2] to Wright Medical Technology, Inc. for $8.4 million cash plus a 5% royalty stream (capped at $30 million) on Wright's net sales of ADCON for the life of the relevant patents.

The debtors have now proposed a liquidating chapter 11 plan. The disclosure statement has been approved and the confirmation hearing is scheduled for April 2, 2004. The plan classifies the debtors' obligations in this manner: (1) class 1–claim of Paul Capital Royalty Acquisition Fund, L.P.; (2) class 2–other secured claims; (3) class 3–priority claims; (4) class 4–general unsecured claims; (5) class 5–liability claims; (6) class 6–subordinated claims; and (7) class 7–equity security holders. Classes 4 through 7 are impaired. The debtors project that class 6 will be paid 0% to 29% and class 7 will not receive a distribution.

Riverside asks to appoint an examiner to look into the plan's treatment of Paul Capital's class 1 claim. The disclosure statement describes this proposed settlement with Paul Capital:

> On April 26, 2001, Gliatech and Paul Capital entered into a Revenue Interests Assignment Agreement (the "Paul Capital Agreement"). Pursuant to the [agreement], Paul Capital paid $7.5 million cash to Gliatech. In exchange, Gliatech was obligated to make royalty payments to Paul Capital related to sales of [its] ADCON line of products. In addition, Paul Capital was granted a security interest in certain of the ADCON assets, and was granted the right to resell or

"put" its rights to Gliatech in certain circumstances, including insolvency.

In April 2002, Paul Capital exercised its "put" right. Accordingly, pursuant to calculations determined by the terms of the Paul Capital Agreement, Gliatech scheduled Paul Capital as holding a claim of $10,044,000 as of the Petition Date. Paul Capital later filed its proof of claim, asserting that it was owed $9,750,000 as of the Petition date and $12,675,000 as of April 26, 2003, including accruals of the "put" price that are analogous to postpetition interest.

As described in the "Sale of the Debtors' Assets," the Debtors' ADCON assets were sold in two parts: (a) the ADCON gel assets were sold to Wright for $8.4 million cash plus the Wright Medical Royalty; and (b) the ADCON solution assets were sold to EMCM for $500,000 cash plus a royalty from EMCM (the "EMCM Royalty"). These assets were sold free and clear of all liens, claims, encumbrances, and interests, with such liens, claims, encumbrances, and interests attaching to the proceeds of the sale.

The Debtors and Creditors' Committee determined that the ... Committee would take the lead role in negotiating with Paul Capital regarding the extent and validity of its claim. Although no party disputed that Paul Capital had a substantial claim against Gliatech, the ... Committee and Paul Capital had significant differences about the extent and validity of the claim. These issues included: the amount of Paul Capital's claim after its exercise of its put rights; the extent of Paul Capital's security interest; whether Paul Capital was enti-

---

its motion. All counsel presented oral argument. These facts are gleaned from the case docket and the debtors' approved disclosure statement.

**2.** ADCON is a biosurgery product.

tled to postpetition accruals of its put price; the value of the Wright Medical Royalty; and to what extent the Debtors were entitled ... to recover from Paul Capital's security the costs of preserving and disposing of the ADCON assets.

After substantial negotiations, the parties agreed on the treatment of the Paul Capital Claim described in the Plan, as full settlement of the above-described issues. Paul Capital will receive from the proceeds of the sale of the ADCON assets $7.3 million cash and an assignment of the Wright Medical Royalty ... Paul Capital will waive any remaining claim whatsoever against the Debtors and the parties will exchange full mutual releases .... [3]

## DISCUSSION

### The positions of the parties

Riverside moves to appoint an examiner to determine the current value of the Wright Medical royalty which is to be assigned to Paul Capital under the plan. Riverside believes that the valuation used in settling the Paul Capital claim is inaccurate and that an accurate valuation will result in a return to Paul Capital that is greater than 100% of its claim. Riverside argues that the appointment is necessary to protect the interests of the class 6 subordinated creditors and the class 7 equity security holders, both of which are impaired under the plan. The debtors and the creditors' committee argue that the statute does not provide for the appointment of an examiner in these circumstances and that the cost of such an appointment is not warranted.

### 11 U.S.C. § 1104

Riverside relies on bankruptcy code § 1104(c)(1), which provides in relevant part that:

If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if–

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate[.]

11 U.S.C. § 1104(c)(1).

An examiner "typically investigate[s] the debtor's business and handle[s] other duties specifically assigned by the bankruptcy court, but do[es] not replace the debtor in possession in handling the day-to-day affairs of the business." *United States v. Schilling (In re Big Rivers Elec. Corp.)*, 355 F.3d 415, 422 (6th Cir. 2004). The examiner's investigation usually focuses on alleged fraud, dishonesty, incompetence, misconduct, mismanagement, or other irregularities. *See* 11 U.S.C. § 1104(c). The bankruptcy court, however, "retains broad discretion to direct the examiner's investigation, including its nature, extent and duration." *Morgenstern v. Revco, D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 501 (6th Cir. 1990). *See also* 11 U.S.C. § 1106(b). Using this discretion, courts have appointed examiners to perform other functions. *See, for example, In re Pub. Serv. Co. of N.H.*, 99 B.R. 177 (Bankr.D.N.H.1989) (au-

---

**3.** Disclosure Statement (Docket 1051).

thorizing the appointment of an examiner to mediate and assist in plan negotiations). A request to appoint an examiner must be substantiated with factual support, *see In re Mechem Fin. of Ohio, Inc.*, 92 B.R. 760, 761 (Bankr.N.D.Ohio 1988); *In re Gilman Servs., Inc.*, 46 B.R. 322, 327 (Bankr. D.Mass.1985), and the costs of the appointment must be considered, *see Gilman Servs. Inc.*, 46 B.R. at 327–28.

 "As the title suggests, the basic job of an examiner is to examine, not to act as a protagonist in the proceedings." *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 156 (Bankr.D.Del. 2002). An appointment under § 1104(c)(1) must, therefore, be in the interests of everyone with a stake in the case, including creditors, equity security holders, and other interests of the estate. *See* 11 U.S.C. § 1104(c)(1). A single creditor group "cannot justify the appointment of a[n] ... examiner simply by alleging that it would be in its interests." *In re Sletteland*, 260 B.R. 657, 672 (Bankr.S.D.N.Y.2001) (citations omitted).

Riverside contends that when the debtors negotiated the treatment of the Paul Capital claim and valued the Wright Medical royalty, they did not protect the interests of the class 6 subordinated claimants or the class 7 equity holders. In particular, Riverside argues that the Wright Medical royalty stream is worth more than the value placed on it by the creditors' committee and the debtors.[4] Riverside, however, merely questions whether the Paul Capital claim was settled

fairly; it does not make any claim of fraud or wrongdoing.

Riverside has utterly failed to show that it would be appropriate to appoint an examiner in this case. Although Riverside frames its request in terms of an investigation, it has not identified anything to be investigated. Instead, the request is to value (or re-value) the Paul Capital claim and the Wright Medical royalty stream for Riverside's use in the confirmation hearing. What Riverside is really saying is that it objects to the proposed plan because it will not receive any distribution and that estate funds should be used to prove that the objection should be sustained. Riverside may have a legitimate objection but, if so, Riverside can investigate the facts that would support such an objection on its own nickel, not that of the other creditors. The individual nature of Riverside's concern is illuminated by the fact that no class 6 and no other class 7 creditor joined in the request. One creditor simply does not have the right to use estate resources for an investigation that will serve its purposes, only.

## CONCLUSION

For the reasons stated, Riverside Contracting LLC's motion to appoint an examiner is denied.

---

4. For support, it points to the debtors' 2001 projections for ADCON sales and argues that Wright Medical has stated that it will bring ADCON to the market as soon as 2004. The debtors challenged these statements, however, and Riverside declined to offer evidence to support them. The debtors noted that the Wright Medical royalty stream is a high risk asset because the product is subject to FDA approval and there is competition in the market.