## In re UAL CORPORATION, et al., Debtors.

### No. 02 B 48191.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 15, 2004.

James H.M. Sprayregen, Alexander Dimitrief, Marc Kieselstein, Kirkland &

Ellis, LLP, Chicago, IL, Attorneys for Debtors.

Robert S. Clayman, Jeffrey A. Bartos, Gerrieria, Edmond & Clayman, P.C., Washington, DC, Attorneys for Association of Flight Attendants–Communication Workers of America, AFL–CIO.

## MEMORANDUM OF DECISION

### EUGENE R. WEDOFF, Chief Judge.

These cases came before the court on a motion of the Association of Flight Attendants–Communication Workers of America, AFL–CIO (the "AFA"), for appointment of an examiner pursuant to § 1104(c) of the Bankruptcy Code (Title 11 U.S.C., the "Code"). The AFA took the position that appointment of an examiner is mandatory, and that the examiner is required to investigate the issue of interest to the AFA: the timing of a decision by United Air Lines, Inc. ("United")—one of the debtors in these cases—to seek modification of its retiree benefits program pursuant to § 1114 of the Code. United opposed the motion on the basis that appointment of an examiner is not mandatory, and that the investigation sought by the AFA would not be appropriate. As discussed below, the appointment of an examiner is mandatory in a case of this size, and the investigation sought by the AFA is appropriate. Accordingly, the motion has been granted.

### Jurisdiction

 Federal district courts have exclusive jurisdiction over bankruptcy cases. 28 U.S.C. § 1334(a). Pursuant to 28 U.S.C. § 157(a), district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such a reference of the pending cases. When presiding over a referred case, a bankruptcy judge has jurisdiction under 28 U.S.C. § 157(b)(1) to enter appropriate orders and judgments in core proceedings within the case. The pending motion for appointment of an examiner is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate). *See WRT Creditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.*, 75 F.Supp.2d 596, 607 (S.D.Tex. 1999) (quoting 1 Collier on Bankruptcy ¶ 3.01[4][c][iv] for the proposition that a motion to appoint an examiner is an administrative matter within the core jurisdiction of the bankruptcy court).

This court therefore has jurisdiction to enter a final order with respect to the AFA's motion.

### Statement of Facts

In March 2003, United filed a motion pursuant to § 1113(c) of the Code to reject its collective bargaining agreements and negotiate new contracts with its unions, including the AFA. As part of the negotiations, United sought reductions in the medical benefit program offered to union employees upon their retirement. On April 29, 2003, the AFA ratified a new collective bargaining agreement that provided significantly reduced medical benefits to its retiring members. Although the new collective bargaining agreement went into effect on May 1, 2003, the changes in retirement benefits did not go into effect until two months later—July 1, 2003.

This presented a choice for AFA members then eligible to retire. If they chose to remain employed after July 1, they would receive only the reduced medical benefits of the new collective bargaining agreement. But if they retired before July 1, they could receive the more generous medical benefits of the old collective bargaining agreement. The months of May and June were thus a potentially critical window of opportunity.

This situation may have encouraged many flight attendants to retire early. According to the AFA, the number of early retirements in the two-month window (approximately 2,100) was greater than the total number in the preceding 57 calendar years (approximately 1,600). However, AFA members retiring during this period had no guarantee that their more generous retirement benefits would continue to be provided. As a debtor in possession, United could seek a reduction in retirement benefits for all retirees under § 1114(f) and (g) of the Bankruptcy Code, upon a showing that such a reduction was "necessary to permit [its] reorganization" and treated "all of the affected parties ... fairly and equitably." AFA members who retired during the two-month window to obtain better medical benefits obviously would have been interested in knowing whether United had plans to seek reductions in these benefits under § 1114.

Although United at all times reserved the right to seek § 1114 relief, it gave no indication that it had determined to seek that relief before July 1, while AFA members were deciding whether to choose early retirement to obtain better benefits. The AFA asserts that an attorney for United went further, telling a union representative during the negotiation of the new collective bargaining agreement that United "would only seek § 1114 relief if there were an unexpected event, like September 11 or the Iraqi War, that seriously harmed United's financial condition."

United first publicly indicated that it might seek relief from its retiree benefit obligations on August 29, 2003, in an oral report to the court on case administration. United stated:

Additional and critically important matters which we're likely to bring before the court at some point relates [sic] to our ... retiree medical benefits. Payments of those pre-petition liabilities in their current amounts will consume a significant portion of our free cash flow in the years following exit. Those liabilities affect our cash flows and, accordingly, complicate the exit financing process. So we are in the process of studying a range of potential options to ensure that the business plan will have sufficient cash flow to accommodate those liabilities.

On January 14, 2004, United announced that it would indeed seek to reduce retirement benefits pursuant to § 1114.

The AFA has asserted that United actually made its decision to pursue § 1114 relief before the July 1 close of the two-month window, and that it withheld this information from AFA members in order to induce senior flight attendants to retire early, with the result that their positions would be filled by less experienced—and less highly compensated—employees. United has responded that it negotiated in good faith with its union employees throughout the bankruptcy proceedings, and it has specifically denied that it decided to seek § 1114 relief before July 1.

The AFA's motion sought the appointment of an examiner to investigate the timing of United's § 1114 decision. The motion was opposed by United, briefed and argued, and granted by this court on an emergency basis. This memorandum sets forth the reasoning supporting that decision.

### Conclusions of Law

The dispute between the AFA and United raises two distinct questions about the application of § 1104(c) of the Code, the provision for appointment of an examiner in Chapter 11 cases. The first question is whether appointment is mandatory in a case like the present one; the second is whether, if an examiner is appointed, the investigation that the AFA seeks must be

pursued. Both questions require an interpretation of the statutory language.

■ Section 1104(c) states:

If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

It is apparent from this language that appointment of an examiner always has four requirements:

· first, the debtor must still be in possession of the estate—a trustee must not have been appointed;

· second, a plan must not have been confirmed;

· third, a party in interest must request the appointment;

· fourth, one of the conditions set out in the numbered paragraphs of subsection (c) must be satisfied—either (1) appointment of the examiner must be in the interests of the estate, or (2) specified unsecured debts must exceed $5 million.

The AFA and United do not dispute that each of these requirements has been met—the last because the debt involved here exceeds the $5 million threshold. Rather, their dispute involves a possible fifth requirement—that the investigation of the debtor proposed by the party seeking appointment be "appropriate."

On this question, United asserts that the statutory language allows appointment of an examiner only "to conduct such an investigation of the debtor as is appropriate," so that, if an appropriate examination is not suggested by the party seeking appointment, the court need not order appointment. In contrast, the AFA asserts that it is the right of the moving party to define the appropriateness of any investigation, so that there is no "appropriateness" requirement—if the four acknowledged requirements have been satisfied, appointment of an examiner is mandatory.

■ Although the question is not free from doubt, the best reading of the statute differs from that proposed by either of the parties: appointment of an examiner is mandatory if the four conditions are met, but the court retains the discretion to determine the nature and scope of the examiner's investigation. This is the holding of the only circuit court decision to consider the question, it best reflects the plain meaning of the statutory language, and it is consistent with the legislative history of the statute.

In *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498 (6th Cir.1990), the court dealt with a Chapter 11 case in which the $5 million debt threshold of § 1104(c)(2) was exceeded, and in which the U.S. trustee sought appointment of an examiner to investigate the leveraged buyout that had formed the debtor. No other party in interest sought the appointment; to the contrary, a group of creditors sought to conduct its own in-

vestigation. The bankruptcy court denied the U.S. trustee's motion, finding that the proposed investigation was premature. In reversing this ruling, the Sixth Circuit held that the appointment of an examiner was mandatory in a case exceeding the debt threshold (and meeting the other acknowledged requirements). *Id.* at 501.

■ The *Revco* decision is based on a persuasive reading of the statutory language.[1] That reading focuses on the alternatives posed by paragraphs (c)(1) and (c)(2). Paragraph (c)(1) calls for appointment of an examiner where the appointment would benefit the estate. The alternative paragraph (c)(2) calls for the appointment where the debt threshold is exceeded. For this second paragraph to mean something, it must require appointment of an examiner (assuming that the other acknowledged requirements are met) even where the appointment of the examiner might not benefit the estate. If the statute granted discretion to refuse to appoint an examiner because no "appropriate" investigation was sought, there would be no distinction between paragraphs (c)(1) and (c)(2)—in any situation where a judge perceived an absence of benefit to the estate, the judge would be able to deny appointment of an examiner on the ground that no investigation was "appropriate." As the court in *Revco* noted, unless paragraph (c)(2) requires appointment of a examiner in cases exceeding the debt threshold "it becomes

indistinguishable" from paragraph (c)(1). 898 F.2d at 501.[2]

There are a few decisions asserting discretion to deny appointment of an examiner in cases exceeding the debt threshold, but none of them deal with the problem of giving meaning to paragraph (c)(2). *See In re Rutenberg,* 158 B.R. 230, 233 (Bankr. M.D.Fla.1993) (denying appointment of an examiner based on the totality of circumstances, including the debtor's status as an individual and the delay an examination would cause); *In re Shelter Resources Corp.,* 35 B.R. 304, 305 (Bankr.N.D.Ohio 1983) (holding that to follow the "so-called mandatory dictates" of § 1104 was not in the interest of the estate); *In re GHR Companies, Inc.,* 43 B.R. 165, 176 (Bankr. D.Mass.1984) (relying on historical policy arguments and a determination that appointment of an examiner was not prudent). Since these decisions all deny appointment of an examiner on the ground that appointment would not be in the interests of the estate, they impermissibly ignore the impact of paragraph (c)(2)'s debt threshold alternative.

■ Finally, to the extent that the language of § 1104(c)(2) could be seen as ambiguous, the subsection's legislative history forcefully indicates that appointment of an examiner was intended to be mandatory in cases exceeding the debt threshold.[3] As detailed in Leonard L. Gumport,

---

1. "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Trustee,* —— U.S. ——, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) (internal quotations omitted).

2. Indeed, if paragraph (c)(2) were not mandatory, then § 1104(c) would have the following meaning: "If specified debt is less than $5

million, it is in the court's discretion to appoint an examiner; and if specified debt is more than $5 million, it is in the court's discretion to appoint an examiner."

3. "Where ... resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984).

*The Bankruptcy Examiner*, 20 Cal. Bankr.J. 71, 83–95 (1992), the focus of the debate over § 1104 was whether appointment of a trustee should be mandatory for public companies (as it was under Chapter X of the former Bankruptcy Act), or whether the debtor should remain in possession in all cases unless a trustee was appointed for cause. The enacted language of § 1104 resolved a disagreement between the Senate and the House of Representatives on this question.[4] The compromise rejected mandatory appointment of a trustee, but, as its sponsors explained, it provided for mandatory appointment of an examiner in large cases as an alternative form of protection against corporate mismanagement. According to the sponsors:

> In order to insure that adequate investigation of the debtor is conducted to determine fraud or wrongdoing on the part of present management, *an examiner is required to be appointed in all cases in which the debtor's fixed, liquidated, and unsecured debts, other than debts for goods, services, or taxes, or owing to an insider exceed $5 million.* This should adequately represent the needs of public security holders in most cases.

124 Cong. Rec. H11,100 (daily ed. Sept. 28.1978), *reprinted in* 1978 U.S.C.C.A.N. 6465, and *reprinted in* D Collier on Bankruptcy App. Pt. 4–2458 (L. King 15th ed.2003); 124 Cong. Rec. S17,417 (daily ed. Oct. 6, 1978), *reprinted in* 1978 U.S.C.C.A.N. 6456, and *reprinted in* D Collier on Bankruptcy App. Pt. 4–2572 (L. King 15th ed.2003); statements of Rep. Edwards and Sen. DeConcini (emphasis added). Accordingly, the weight of prece-

dent, the language of § 1104, and the legislative history all indicate that appointment of an examiner is mandatory in this case.

■ However, this determination leaves open the second question: the nature, scope, and duration of the investigation to be conducted by the examiner. Section 1104 directs that the examiner be appointed to conduct "such an examination of the debtor as is appropriate" but does not specify how the determination of appropriateness should be made. There would be substantial potential for abuse and waste of estate assets if, as the AFA has argued, any party in interest in a case exceeding the debt threshold could obtain appointment of an examiner to investigate whatever matters that party specified. For example, a creditor with a simple contract claim might allege that the debtor was opposing its claim in bad faith and demand that an examiner be appointed to investigate the merits of the debtor's defense. Considerations of this sort indicate that the court presiding over a large bankruptcy case should have the authority to limit examiner investigations to "appropriate" subjects, methods, and duration, and *Revco* so states. *Revco*, 898 F.2d at 501 ("[T]he bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration.").

This reading of the statute is consistent with mandatory appointment, but it makes the examiner's investigation subject to a court order issued after notice and a hearing at which all parties in interest may participate, rather than subject to dictation by the party seeking the appointment. If it appears that a party seeks appointment

---

4. The conflicting bills were H.R. 8200, 95th Cong., 1st Sess. § 101 (proposed 11 U.S.C. § 1104) (1977) (reported by the House Judiciary Committee), and S. 2266, 95th Cong., 2nd Sess. § 101 (proposed 11 U.S.C. § 1104) (1978) (reported by the Senate Judiciary Committee).

of an examiner to investigate a private dispute with the debtor that does not raise issues bearing on the quality of the debtor's management, the examiner might be directed simply to investigate whether there is good cause to engage in the inquiry suggested by the movant.[5]

 However, in the present case, such a limited investigation is not sufficient. The question of whether United misled its flight attendants about the likely effect of retirement during the two-month window is more than a two-party dispute between United and the AFA; it bears on United's overall good faith in dealing with its employees and former employees. This is an issue in United's pending effort to obtain relief under § 1114(f) and (g), since modification of retirement benefits can only be ordered if all affected parties are treated fairly and equitably. But the issue has a broader impact here: fair treatment of employees is key to any successful reorganization of a debtor's business. And an investigation of the AFA's allegations by a neutral examiner is likely to lead to a quicker and less contentious resolution of the AFA's concerns than litigation between the parties to a contested § 1114 motion. Indeed, an examiner's investigation limited to the timing of United's decision to pursue § 1114 relief should be able to be concluded within 30 days, as the AFA has suggested. A finding by the examiner that United did not act in good faith with respect to flight attendants who retired during the two-month window would then allow the ongoing § 1114 process to include provisions addressing their situation. Conversely, a finding by the examiner that United acted in good faith

would allow the process to go forward without the atmosphere of mistrust that might otherwise exist. Thus, the investigation proposed by the AFA is appropriate.

### Conclusion

For the reasons set out above, the AFA's motion for appointment of an examiner has been granted by a separate order, directing an investigation of whether United determined to pursue relief under § 1114 of the Bankruptcy Code prior to July 1, 2003, and directing that the results of the investigation be reported prior to the court's subsequent monthly hearing date.

---

**5.** A finding by the examiner that further investigation was not appropriate would be akin to the finding of a Chapter 7 trustee that a debtor has no assets worth administering. In such cases, the trustee issues a notice to that effect and no administration takes place unless assets are later discovered. *See* Fed. R.Bankr.P.2002(e) (providing for a "notice of no dividend").