**In re LORAL SPACE & COMMUNICATIONS LTD., et al., Debtors.**

Nos. 03–41710 (RDD), 03–41709(RDD), 03–41711(RDD) to 03–41728(RDD).

United States Bankruptcy Court, S.D. New York.

Sept. 2, 2004.

*MEMORANDUM DECISION DENYING MOTION FOR THE APPOINTMENT OF AN EXAMINER*

ROBERT D. DRAIN, Bankruptcy Judge.

Loral Space & Communications Ltd. ("Loral") and its affiliated debtors and debtors in possession (with Loral, the "Debtors") operate one of the world's leading communications satellite businesses. On August 5, 2004 an ad hoc committee stating that it represents holders of about 8.4% of Loral's common stock (the "Ad Hoc Committee") moved for the appointment of an examiner under sections 1104(c)(1) and (2) of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, "to provide a complete appraisal of the Debtor assets and liabilities in question." The Debtors and the Official Committee of Unsecured Creditors (the "Creditors' Committee") objected to the motion, and the Court held a hearing on August 19, 2004. This Memorandum Decision supplements the Court's bench ruling at the close of the August 19, 2004 hearing denying the Ad Hoc Committee's motion.

*Background*

The Debtors filed their chapter 11 petitions on July 15, 2003. Loral, a public company, has 44,072,978 shares of issued and outstanding common stock.[1] Loral also has 4,479,620 shares of issued and outstanding preferred stock,[2] and the Debtors have issued or guarantied approximately $1,049,000,000 of outstanding unsecured funded debt in addition to having incurred a substantial amount of unsecured trade debt.[3]

At the start of these cases, Loral also owed approximately $1 billion of bank

Tony Christ (pro se) and Jeffrey M. Swarts (pro se), for the ad hoc Loral Stockholders Protective Committee.

Weil, Gotshal & Manges, by Stephen Karotkin, New York City, for Loral Space & Communications Ltd. and affiliated debtors.

Akin, Gump, Strauss, Hauer & Feld LLP, by Russell L. Reid and David H. Botter, New York City, for the Official Committee of Unsecured Creditors.

1. See Schedule 4 to the Affidavit of Eric J. Zahler Pursuant to Local Bankruptcy Rule 1007–2, sworn to July 15, 2003 ("Zahler Affidavit").

2. Zahler Affidavit, Schedule 4.

3. Zahler Affidavit ¶ 16.

debt[4] secured by its subsidiaries' cash and other assets, and the Debtors had entered into an agreement to sell a substantial portion of the banks' collateral under section 363(b) of the Bankruptcy Code, subject to higher and better offers. A goal of the sale was to substantially delever the balance sheet by paying off the secured debt with sale proceeds. Most of the activity early in these cases, therefore, centered on the sale process and, more specifically, on the Creditors' Committee's efforts to revise the Debtors' proposed auction procedures to maximize sale value and, ultimately, on the Creditors' Committee's strenuous opposition to the proposed sale. After a three-day contested hearing, the Court approved the sale by Order dated October 30, 2003, the sale has since closed (although not before more disputes between the Creditors' Committee and the Debtors, as well as the purchaser, regarding purchase price adjustments), and the secured bank debt has been paid off.

Several weeks followed during which the Debtors and the Creditors' Committee remained at odds over the best course for the Debtors' remaining substantial business and these chapter 11 cases. After, among other things, fairly heated conferences with the Court regarding the plan formulation process, the Debtors and the Creditors' Committee apparently worked through their major differences over both process and substance, however, and on July 22, 2004 the Debtors announced their agreement with the Creditors' Committee on the terms of a chapter 11 plan.[5]

The announcement stated that the proposed chapter 11 plan would not provide for any distributions to Loral's preferred and common shareholders, and the plan as filed on August 19, 2004 does not provide for any such recovery.

Originally the Ad Hoc Committee was not interested in the appointment of an examiner. Instead, the Ad Hoc Committee's goal until recently has been to obtain the appointment of an official shareholders' committee, the U.S. Trustee having previously determined not to appoint one. The Ad Hoc Committee first moved for the appointment of an official shareholders' committee in September, 2003, alleging that management was not acting in the interests of common shareholders and relying, to establish this proposition, on the considerable decline in the trading price of Loral's shares during the months before the chapter 11 filing, as well as on certain prepetition charge-offs by Loral for accounting purposes that, according to the movants, artificially impaired the common stock's value.

The Ad Hoc Committee's first motion for the appointment of an official shareholders' committee was denied after a hearing on December 2, 2003. The Ad Hoc Committee made a second motion on December 2, 2003, contending, among other things, that it, not the Debtors, should manage the sale of the banks' collateral. This motion also outlined the proposed terms of a chapter 11 plan that the Ad Hoc Committee had based on a bid by a poten-

4. Zahler Affidavit, Schedule 2.

5. I have noted the conflicts between the Debtors and the Creditors' Committee not to cast aspersions but because the Ad Hoc Committee has made the relationship between the Debtors and the Creditors' Committee an issue in its motion for the appointment of an

examiner, contending that the Debtors and the Creditors' Committee have worked hand in glove since the start of these cases to obtain confirmation of a chapter 11 plan that wrongfully deprives common shareholders of any distribution. The facts, as described above, do not support this allegation.

tial third party purchaser that it had admittedly made up.[6]

The hearing on the Ad Hoc Committee's second motion for an official shareholders' committee was adjourned on consent to December 2, 2003 as the sale process played out. At the conclusion of the December 2, 2003 hearing the Court denied the Ad Hoc Committee's second motion, having found, among other things, that it was unlikely, even in a best case scenario, that common shareholders would receive a meaningful distribution on an absolute-priority basis, and that it was reasonable to assume that the Debtors were hopelessly insolvent. *See, e.g., In re Williams Communications Group, Inc.*, 281 B.R. 216, 220, 222 (Bankr.S.D.N.Y.2002); *In re Northwestern Corp.*, 2004 WL 1077913, 2004 Bankr.LEXIS 635 (Bankr.D.Del. May 13, 2004) (discussing valuation issues in the context of motions for the appointment of an official shareholders' committee). Because the valuation evidence did not yet fully reflect the effect of the sale and related de-leveraging of the Debtors' businesses, however, the Court recognized that a material increase in value might support a renewed motion for an official shareholders' committee later on.

On May 2, 2004 the Ad Hoc Committee moved again for the appointment of an official shareholders' committee, although this third motion was not prompted by a material improvement in Loral's fortunes, but, rather, by the Debtors' announcement of their agreement with the Creditors' Committee on the terms of a chapter 11 plan providing for no recovery by common shareholders. This provoked the Ad Hoc Committee to assert again that Loral was not properly looking after the shareholders' interests and that the estate should pay for an official shareholders' committee and professionals to do so.

Once more the Ad Hoc Committee contended that Loral was worth several hundreds of millions of dollars more than the value ascribed to it by the Debtors and the Creditors' Committee, who, the Ad Hoc Committee contended, had artificially depressed their valuation analyses starting from before the commencement of these cases in order to obtain this hidden value for themselves. To support these assertions, the Ad Hoc Committee described various assets that it believed Loral had either undervalued or not valued at all. The Ad Hoc Committee therefore sought the appointment of an official shareholders' committee for the primary purpose of conducting a valuation of the Debtors that would corroborate its view of the Debtors' true worth and thus establish that Loral was able to provide for substantial distributions to common shareholders. In addition, the Ad Hoc Committee alleged that the Debtors' management had engaged in numerous misrepresentations (apparently all, however, relating to prepetition statements by senior management regarding the value of Loral and its common stock

---

**6.** The amount of the wholly hypothetical bid turned out to be hundreds of millions of dollars higher than the actual amounts bid (including an indicative bid by the third party that the Ad Hoc Committee had suggested would be the likely purchaser in its imaginary scenario). Moreover, in derogation of section 1129(b) of the Bankruptcy Code the Ad Hoc Committee's plan concept provided for a recovery by unsecured creditors of between only 40% to 65% while common shareholders would receive $1.50 per share (approximately $66 million), plus 5% of reorganized Loral's new common stock. The Ad Hoc Committee also proposed, contrary to law, *see, e.g., In re Executive Office Centers, Inc.*, 96 B.R. 642, 649–50 (Bankr.E.D.La.1988), that the allowed amount of unsecured claims could be reduced to the amount that claim purchasers and bondholders paid for them. In sum, the Ad Hoc Committee's plan proposal did not make much sense.

that are the subject of pending shareholder class actions) and self-dealing.

At the close of the May 21, 2004 hearing, however, I found that the self-dealing allegations were either far-fetched or pertained to transactions that had occurred so long ago that any avoidance actions would appear to be time-barred. I further found that the Creditors' Committee was appropriately incentivized, in any event, to pursue causes of action against insiders, obviating the need to appoint another committee to undertake such work. The Creditors' Committee was motivated to pursue bona fide causes of action on behalf of the estates because, contrary to the Ad Hoc Committee's allegations, the Ad Hoc Committee had again failed to show a reasonable possibility that common shareholders would receive a meaningful distribution. Instead, it appeared that Loral's value had not materially increased since the December 2004 hearing on the Ad Hoc Committee's last motion for the appointment of an official equity committee, with common shareholders appearing to be at least as "out of the money" as before. By order dated May 28, 2004 I denied the Ad Hoc Committee's third motion for the appointment of an official equity committee.

In none of the above motions did the Ad Hoc Committee seek alternative relief in the form of the appointment of an examiner. Another group of common shareholders did file a "joinder" to the Ad Hoc Committee's third motion for the appointment of an official shareholders' committee that stated this group's support for the appointment of an examiner. However, even after that filing the Ad Hoc Committee did not adopt its allies' position that an examiner should, in the alternative, be appointed.[7] The Ad Hoc Committee's goal instead continued to be to obtain the appointment of an official committee and estate-paid professionals, whom they expected to control, to prove that the Debtors were undervalued.

The Ad Hoc Committee's appeal of the order denying its third motion for the appointment of an official shareholders' committee is pending.

On August 5, 2004 the Ad Hoc Committee filed the present motion for the appointment of an examiner for the purpose of conducting a comprehensive valuation of the Debtors. Thus, the present motion seeks the same estate-funded valuation (with the exception that the valuation would be by a disinterested examiner) that the Ad Hoc Committee had previously wanted an official shareholders' committee to prepare. At the August 19, 2004 hearing, the Ad Hoc Committee's representatives candidly acknowledged that they never would have sought the appointment of an examiner to prepare a valuation if they had been able to persuade the Court to appoint an official shareholders' committee to do the same work.

To support its request for the appointment of an examiner, the Ad Hoc Committee made the same arguments that it had

---

7. Preferred shareholders also joined in the Ad Hoc Committee's third motion for the appointment of an official shareholders' committee, but specifically requested that the Court not appoint an examiner. In denying the Ad Hoc Committee's May 2004 motion, I noted that because the other shareholder group had joined in a motion that did not seek the appointment of an examiner, the portion of its purported joinder seeking such relief must be denied. I also noted that I did not believe that the examiner's "investigation" provided for in section 1104(c) of the Bankruptcy Code was meant to encompass the preparation of a going concern valuation of the debtor to be used for the benefit of one group of stakeholders in a contested confirmation hearing, as this second shareholder group apparently desired.

previously made for the appointment of an official shareholders' committee. First, it contended that the Debtors were undervaluing, and in some instances intentionally ignoring, many of their most valuable assets. The Ad Hoc Committee largely relied on the valuation arguments in its third motion for an official shareholders' committee to support this contention, with no more persuasive effect. The only new information offered was the recently reported announcement by the purchaser at the Debtors' section 363(b) sale of the banks' collateral that it, in turn, has agreed to sell its assets—including not only the approximately $1 billion of assets purchased from the Debtors but also the rest of its substantial business—for approximately $3.1 billion and the assumption of approximately $2 billion of debt. It was not clear, however, how this price negatively reflected on the Debtors' management, because the Ad Hoc Committee did not offer evidence of the value of the other assets sold in this transaction and, thus, offered no new evidence that the Debtors had sold their assets at auction for less than fair value. On the contrary, the Debtors had established at the sale hearing in December 2003 that they had been able to obtain a premium when auctioning the assets because of the unique value of those assets to the purchaser's business.

In addition, the Ad Hoc Committee again alleged that the Debtors and the Creditors' Committee and their respective professionals were improperly colluding to depress their valuations of Loral. To support this allegation, besides repeating the arguments made and found seriously wanting at the May 21, 2004 hearing on the motion to appoint a shareholders' committee, the Ad Hoc Committee stretched to discover other allegedly nefarious connections among present and former management, counsel for the Debtors, members of the Creditors' Committee, and the Creditors' Committee's counsel that were at least as far-fetched.

For example, the Ad Hoc Committee saw ominous signs in the fact that a San Francisco conference on private equity fund formation had been attended, around the time that the Debtors and the Creditors' Committee were negotiating their chapter 11 plan, by, among many others, a lawyer from the Debtors' bankruptcy counsel (who does not appear to have worked on these chapter 11 cases), a lawyer from the Creditors' Committee's law firm (who has not worked on these chapter 11 cases and is no longer at the firm), a fund manager for one of the largest unsecured creditors, and an investment banker from a firm that has no connection to the Debtors but whose firm had recently announced a transaction, involving another company in a similar business.[8] The Ad Hoc Committee also alleged that, starting before the petition date, a former officer of the Debtors has acted as the middleman to broker the agreement between the largest unsecured creditors and the Debtors to wipe out the shareholders, and went so far as to allege that this former officer's influence may reach even deeper because he shares his last name—"Targoff"—with a program manager at one of the Debtors' sometime partners, Raytheon Corporation. No credible evidence was offered, however, that this alleged middleman has played any role in these cases, or, for that matter, in support of any of the Ad Hoc Commit-

8. The Ad Hoc Committee believed that this investment banker's attendance at the conference was significant because the third-party transaction that his firm had worked on, the Committee suggests, established, by analogy, a higher value for certain of the Debtors' assets—something, it believes, that he may have communicated to the other attendees.

tee's other allegations of misconduct.[9]

While it appeared that the Ad Hoc Committee's representatives did not make these arguments cynically, the Ad Hoc Committee advanced no objective basis to establish a reason to investigate the Debtors, the Creditors' Committee or their respective professionals for fraud, collusion or other reprehensible acts. Instead its allegations were obviously conclusory and irresponsible.[10]

Thus there was no basis to find that the appointment of an examiner to conduct a comprehensive valuation of the Debtors as a going concern as requested by the Ad Hoc Committee was in the interests, in general, of creditors, equity security holders and other constituents of the Debtors' estates. The benefits of such an appointment would be negligible, given that the Ad Hoc Committee's allegations of misconduct are so lacking in objective support that they merely circle back to a difference of opinion between the Ad Hoc Committee and the Debtors and the Creditors' Committee about what the Debtors are worth. Such benefits would be particularly small because, as discussed below, such a valuation could not properly be used in a partisan way in any particular contested context, such as a confirmation hearing on the Debtors' chapter 11 plan. The cost of such a valuation exercise, on the other hand, would be high, both in dollars (qualified investment bankers alone generally charge between $75,000 and $150,000 per month for such services)[11] and in the resulting disruption of these chapter 11 cases.

### Discussion

There are two grounds for the appointment of an examiner under section 1104(c) of the Bankruptcy Code: if "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate," 11 U.S.C. § 1104(c)(1), and if "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." 11 U.S.C. § 1104(c)(2).

■■■ A. 11 U.S.C. § 1104(c)(1). The Ad Hoc Committee's motion clearly fails the "in the interests of the estate" test of section 1104(c)(1) of the Bankruptcy Code. First, under section 1104(c)(1) the appointment of an examiner must be in the interests of the estate in general. *See, e.g., In re Gliatech, Inc.*, 305 B.R. 832, 836 (Bankr. N.D.Ohio 2004), in which the court held, "As the title suggests, the basic job of an examiner is to examine, not to act as a protagonist in the proceedings. An appointment under § 1104(c)(1) must, therefore, be in the interests of everyone with a stake in the case." (citations omitted). *See*

9. The Ad Hoc Committee also saw cause for concern in the fact that one of the fund managers of one of the largest unsecured creditors shares the same last name—"Goldstein"—with the lawyer who formerly worked for counsel for the Creditors Committee and attended the infamous San Francisco conference discussed above. Apparently the Ad Hoc Committee's fears were exacerbated by its representative's mistaken belief that one of the Creditors' Committee's lead lawyers also shares the name "Goldstein" (The representative acknowledged at the August 19 hearing, however, that this lawyer's name actually is "Golden.")

10. The Ad Hoc Committee has not been able to hire a lawyer to represent it (although the group of common shareholders that joined in the Ad Hoc Committee's third motion for the appointment of an equity committee was represented by counsel). Accordingly, the Court has given the Ad Hoc Committee's representatives unusual leeway. This does not, however, justify allegations that do not stand up to logical scrutiny.

11. The cost would also include the professional costs to be incurred by others, primarily the Debtors and the Creditors' Committee.

also *In re Sletteland*, 260 B.R. 657, 672 (Bankr.S.D.N.Y.2001) (accord). Here, however, the appointment of an examiner would, at best for the shareholders, advance only their interests in opposition to the Debtors' plan.[12]

In the closely analogous *Gliatech* case, the parochial nature of the proposed examiner's appointment to buttress the movant's valuation argument against a chapter 11 plan required the denial of an examiner motion:

> What [movant] is really saying is that it objects to the proposed plan because it will not receive any distribution and that estate funds should be used to prove that the objection should be sustained. [Movant] may have a legitimate objection but, if so, [movant] can investigate the facts that would support such an objection on its own nickel, not that of the other creditors.

305 B.R. at 836. Like the movant in *Gliatech*, the Ad Hoc Committee may have a legitimate objection to confirmation of the Debtors' chapter 11 plan,[13] but it is not entitled to the appointment of an examiner under section 1104(c)(1) of the Bankruptcy Code to help it advance that objection.

Second, the appointment of an examiner would not be in the estates' interest in the light of the negligible benefits of the requested valuation balanced against its cost. *See In re Gilman Services., Inc.*, 46 B.R. 322, 327–28 (Bankr.D.Mass.1985) (under section 1104(c)(1), movant must demonstrate that "[t]he benefit to the estate and the attendant protections of an examiner's investigation ... outweigh the expenses"); 7 *Collier on Bankruptcy* ¶ 1104.03[3] (15th ed.2004) at 1104–40.1 (accord). Given that the Ad Hoc Committee's allegations of wrongdoing are unsupported and, therefore, not a separate basis for appointing an examiner,[14] the benefit to the estates would be limited to the ability of parties in interest merely to see another valuation. This is because, as noted above, it would be improper to permit shareholders to use the valuation in an adversarial context, such as a contested confirmation hearing. Thus, the requested appointment would serve little or no legitimate purpose except, perhaps, to mollify the Ad Hoc Committee. On the other hand, the cost to the Debtors' estates of a comprehensive valuation would be high, as noted above.

**12.** The Ad Hoc Committee argued that if the examiner's valuation instead corroborated the valuations of the Debtors and the Creditors' Committee it also would benefit the estates by "lifting the black cloud that overhangs these cases." However, such a cloud is largely, if not entirely, in the eyes of the beholders. Such a valuation would more likely confirm the impression that the estates had just wasted a lot of money.

**13.** Because the valuation evidence relevant to whether a motion for the appointment of an official shareholders' committee is not binding for other purposes, the Ad Hoc Committee remains free to make its valuation case in opposition to confirmation of the Debtors' chapter 11 plan. *In re Williams Communications*, 281 B.R. at 221

**14.** *See In re Gilman*, 46 B.R. at 327 ("[M]ere allegations of misconduct will not suffice [un-

der section 1104(c)(1)]; there must be a factual basis supporting the need for an independent investigation."); *In re Bel Air Assocs., Ltd.*, 4 B.R. 168, 173 (Bankr.W.D.Okla.1980) ("[A]lthough there is no requirement that actual misconduct or incompetence be proved, there should at least be some evidence presented that such allegations have some factual basis. To construe the statute otherwise would mean that an examiner must be appointed to conduct a complete investigation in every case where a party in interest makes a naked accusation, whether it be in good faith or bad."); *see also* 7 *Collier on Bankruptcy* ¶ 1104.03[3] at 1104–40.1–40.2 ("The party requesting the appointment must demonstrate by probative evidence that the facts of the case justify the appointment of an examiner.").

■ **B. 11 U.S.C. § 1104(c)(2).** On its face, section 1104(c)(2) of the Bankruptcy Code appears to require the appointment of an examiner whenever a debtor's unsecured non-trade non-insider debt exceeds $5 million. That is, section 1104(c)(2) appears to set forth a purely mechanical mandatory test, which would be satisfied in Loral's case. This conclusion would appear to be particularly appropriate, moreover, if, as here, the debtor is a public company with public debt, because the legislative history of section 1104(c) reflects Congress' desire to provide "extra protection to stockholders of public companies through the mechanism of an independent functionary." *In re Gilman*, 46 B.R. at 327; *see also In re Rutenberg*, 158 B.R. 230, 233 (Bankr.N.D.Fla.1993); *In re The GHR Cos., Inc.*, 43 B.R. 165 (Bankr. D.Mass.1984) (each relying on legislative history to support refusal to appoint an examiner for *non*-public debtors, notwithstanding satisfaction of $5 million threshold under section 1104(c)(2)). *See generally* 7 *Collier on Bankruptcy* ¶ 1104.03[2] at 1104–36 (discussing legislative history of section 1104(c)(2)'s "mandatory" appointment provision).

■ Section 1104(c)(2) of the Bankruptcy Code cannot be read, however, in isolation from the rest of the statute, and a reading of the full text leads, in this particular context, to the denial of the motion for two related reasons.

First, while it is "well established that the bankruptcy court has considerable discretion in designing an examiner's role," *In re Mirant Corp.*, 2004 Bankr.LEXIS 1105, p. 5–6 (Bankr.N.D.Tex. July 30, 2004); *see also* 7 *Collier on Bankruptcy* ¶ 1104.03[1] at 1104–35, an examiner should be appointed under the plain language of section 1104(c) of the Bankruptcy Code only to conduct an "investigation." 11 U.S.C. § 1104(c). *See also In re Bradlees Stores, Inc.*, 209 B.R. 36, 39–40 (Bankr.S.D.N.Y.1997) ("The main purpose of an examiner ... is primarily investigative."); 7 *Collier on Bankruptcy* ¶ 1104.03[1] at 1104–35 (accord). It is generally understood that an "investigation" under section 1104(c) is of conduct—that is, "of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor," 11 U.S.C. § 1104(c)—or of a particular transaction or series of transactions,[15] in order to reveal ways and means to protect or augment the estate. *In re Gliatech*, 305 B.R. at 835. Out of the thousands upon thousands of chapter 11 cases in which there has been unsecured non-insider non-trade debt in excess of $5 million, however, the Court has not located one instance of the appointment of an examiner to conduct an abstract postpetition going concern valuation of the debtor.[16] Such a valuation anal-

---

15. *See also* 11 U.S.C. § 1106(a)(3), (b).

16. The closest case was the *sua sponte* expansion of an already-appointed examiner's duties in *In re Mirant*, 2004 Bankr.LEXIS 1105, to include the examiner's possible recommendation to the court, after consulting and attempting to mediate with various parties in interest, about whether *litigation should be commenced on* "the valuation for purposes of the plan of one or more of Debtors," among other issues affecting the advancement of the debtors' reorganization. *Id.* at 18. That potential task, however, obviously is a far cry from authorizing an examiner simply to conduct a going concern valuation in a vacuum. The distinction is made even more clear by the fact that the equity committee in *Mirant* requested relief strikingly similar to the Ad Hoc Committee's request—to expand the examiner's duties to include an independent review and analysis of the debtors' value—which was a different role than that actually ordered by the *Mirant* court. *See* "Motion of the Official Committee of Equity Security Holders to Modify Order Defining Role of Examiner to Broaden Scope of

ysis is not aimed at uncovering causes of action or misconduct or otherwise protecting the estates, nor would such a valuation (as valuation is an inexact cross between science and art in which an examiner could claim no special expertise over any other qualified investment banker) lead to any particularly worthwhile insights for the Court separate and apart from furthering one group's partisan interests. Thus the Court agrees with the *Gliatech* court that such a valuation exercise is wholly inconsistent with an examiner's "investigatory" function under section 1104(c) and contrary to the meaning of the statute. 305 B.R. at 837.

■ In addition, the statute makes it clear that Congress intended the bankruptcy court to control the nature and extent of examiners' investigations. *See* 11 U.S.C. § 1104(c), which states that "the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate." *See also* 11 U.S.C. § 1106(a)(3), as incorporated by 11 U.S.C. § 1106(b) (listing examiners' duties "except to the extent the court orders otherwise"). Thus, although the majority view is that section 1104(c)(2) requires the appointment of an examiner if the $5 million threshold is met, courts unanimously agree that section 1104(c)(2) is not a blank check, that the court shall prescribe the parameters of examiners' investigations as is appropriate. *See, e.g., In re Revco D.S., Inc.,* 898 F.2d 498, 500–01

(6th Cir.1990); *In re UAL Corp.,* 307 B.R. 80, 84 (Bankr.N.D.Ill.2004). As stated in 7 *Collier on Bankruptcy* ¶ 1104.03[2][b] at 1104–39–40:

> [T]he mandatory nature of [section 1104(c)(2)] was not intended and should not be relied on to permit blatant interference with the chapter 11 case or the plan confirmation process. Failure to make a timely request for the appointment of an examiner may provide the court with a basis for denying the request on the ground of laches. Alternatively, a court might grant the request of an examiner but so limit the role assigned to the examiner that substantial interference will be prevented. Section 1104(c) states that the "court shall order the appointment of an examiner to *conduct such an investigation of the debtor as is appropriate.*" The limitations and proscriptions regarding the scope of the investigation are subject only to the imagination of the bankruptcy judge.... Accordingly, in an appropriate case it is possible both to comply with the clear statutory provisions and also to consider their practical implications.

(Citations omitted; emphasis in the original.)

Some courts have reconciled the "mandatory" nature of section 1104(c)(2) of the Bankruptcy Code with the clearly discretionary role that the statute requires the

---

Examiner's Duties," offered by the Ad Hoc Committee at the August 19, 2004 hearing.

Moreover, it is clear that the examiner's duties in *Mirant* were expanded in the light of (1) a recent turnover in the debtor's senior management, (2) recent changes in the composition of certain committees, and (3) "troubling instances of mistakes concerning information and even of an absence of professionalism among various estate professionals," which, when combined with (4) the

inherent conflicts among the various debtors because of their intercompany claims, made for "a volatile situation" in which the court believed that the reorganization process could be exploited. *Id.* at 14–16. Thus, the court concluded that the active involvement of a disinterested third party was required to facilitate the reorganization process by coordinating and mediating among the parties. Once again, that reorganization-facilitative role is a far cry from the valuation sought by the Ad Hoc Committee.

court to play by positing that it may be appropriate in certain instances to appoint an examiner under section 1104(c)(2) to decide only whether another examiner should conduct an investigation:

> If it appears that a party seeks appointment of an examiner to investigate a private dispute with the debtor that does not raise issues bearing on the quality of the debtor's management, the [examiner] might be directed simply to investigate whether there is good cause to engage in the inquiry suggested by the movant.

*In re UAL,* 307 B.R. at 86–87. It also may be appropriate under certain circumstances to appoint an examiner under section 1104(c)(2) to investigate only whether management and estate-compensated professionals' processes for reviewing claims or other issues are fair and regular, rather than having an examiner investigate the underlying claims or issues. However, where, as here, the requested task to be performed not only is far removed from the normal "investigatory" function of an examiner, as set forth in the statutory text, but also is unsupported by credible allegations of misconduct, appointing an examiner to perform one of the more limited types of review described above would unduly usurp the court's discretion.

Moreover, it is not at all clear that the court should go the extra mile under section 1104(c)(2) to try to conceive of an appropriate investigation if the movant has sought a wholly inappropriate one. Unless the court decides to appoint an examiner *sua sponte,* the statute requires that consideration of the appointment of an examiner be conducted only on request by a party in interest after notice and a hearing. 11 U.S.C. § 1104(c). If the only requested appointment is wholly inappropriate, why should the court stretch to fashion a more appropriate job description for an examiner if none would justify *sua sponte* appointment? [17]

In any event, reaching to find some appropriate role for an examiner is inappropriate here, where all concerns circle back to analysis of the Debtors' valuation, an

---

[17.] A good example of the pitfalls inherent in such an approach is illustrated by exchanges at the hearing on the present motion. At the August 19, 2004 hearing, the Court suggested to the Ad Hoc Committee's representatives that it was considering the possibility of appointing an examiner with a limited budget and a limited amount of time to complete her work, not to conduct a going concern valuation as the Ad Hoc Committee had requested but, instead, to review whether the Debtors and the Creditors' Committee's professionals had followed proper procedures in conducting their valuation analyses. When asked whether they would accept that more limited role for an examiner, the Ad Hoc Committee's representatives initially responded affirmatively, but their response was qualified by concerns that the Ad Hoc Committee had not had enough time to think about the suggestion and that it would want to become comfortable with the adequacy of the budget and the description of the examiner's proposed duties. The Court also stated that it was inequitable for the Debtors to have to defend against the Ad Hoc Committee's appeal of the denial of the appointment of an official shareholders' committee, if—outside of the appellate record—the Ad Hoc Committee obtained the appointment of an examiner to conduct the same valuation that the proposed official shareholders' committee would have undertaken. *Cf. Schepps Food Stores, Inc.,* 148 B.R. 27, 30–31 (S.D.Tex.1992); *In re Bradlees Stores,* 209 B.R. at 39–40 (denying motions for the appointment of an examiner under section 1104(c)(2) on the basis of *laches* ). In response, the Ad Hoc Committee's representatives again equivocated, stating that they would not want to relinquish their appeal until they were satisfied with the nature of the examiner's appointment and investigation. Thus, it was clear that the Court's alternative trial balloon proposals were going to lead only to negotiations, which, while they might be entirely appropriate among the parties, were not something the Court felt it should pursue at the hearing.

exercise that, as noted above, is ripe for partisan abuse and, if not so abused, provides negligible benefit at high cost.

### Conclusion

Therefore, notwithstanding the legislative history of section 1104(c)(2) of the Bankruptcy Code, the appointment of an examiner pursuant to the terms of sections 1104(c)(1) and (c)(2) of the Bankruptcy Code to conduct a going concern valuation of the Debtors should be denied.

An order consistent with this memorandum decision has been separately entered.